This morning is 23-9609 O.C.V. v. Garland. Ms. Dutton. Good morning, Your Honors, and may it please the Court. I'm Anne Dutton for Petitioners, the C.R. Family, and I'll try to reserve three minutes for rebuttal. The precedential decision issued by the Board of Immigration Appeals in the C.R. Family's case, which was captioned matter of M.R.M.S., establishes a heightened test for proving nexus in an asylum claim. This interpretation conflicts with the statute, which provides that nexus can be satisfied so long as at least one central reason for persecuting the applicant is their protected ground. As the Supreme Court recently instructed in Loper-Bright, the task now before this panel is to independently determine the meaning of the nexus statute and then decide whether M.R.M.S. comports with that interpretation, giving no deference to the agency's views. And because M.R.M.S. does indeed conflict with the statute, we would ask that this Court join the Sixth Circuit in rejecting M.R.M.S. Or in the alternative, find the legal and factual errors in the application of the standard to the C.R. Family's case provide separate basis for remand. Did M.R.M.S. correctly establish the applicable legal framework in the sense that it did cite to and refer to LEA and Orianas? Are you challenging the correctness of those decisions, or is it merely the application in this case of a correct legal standard? We're not challenging LEA-1 or the Oriana-Racinos decision, Your Honor. We're challenging the framework of M.R.M.S. to the extent that it goes farther than the framework set out, particularly in LEA-1. So it's a misapplication of M.R.M.S.? Yes. I think you could look at it that way, although I think the Board sees it as kind of the evolution of the LEA-1 test. But we argue, of course, that M.R.M.S. goes farther than LEA-1, because while LEA-1 set out the principle that a family being a means to an end is insufficient to establish centrality under the statute, M.R.M.S. takes that reasoning and says that if the family is a means to an end, it's impossible to establish centrality under the statute. So you don't challenge the means-end framework itself that Oriana's used, right? Pardon me, Your Honor. We do challenge the—I think, yes, we do, Your Honor. We think that that contorts the test asked by the statute. The statute is focused only on whether the protected ground was one central reason for harm. An M.R.M.S. instead asks whether the protected ground was a central part of the persecutor's overall goals or their overall scheme. So you're saying that this distinction that comes up occasionally between the means and the end doesn't matter? Or are you saying that only ends matter and means do not? We think that the distinction between means and ends that the Board makes a mandatory part of the analysis in this case is not the question asked by the statute. So that still doesn't answer my question. Are you saying that if there is a violation of the statute in the sense that there was one of these prohibited reasons that was the motivator, but it was only as to the means and not the end, would that violate the statute? To make sure I'm understanding. Yeah, you could have one of two things. You could say it has to be an end that is protected or you don't get that protection. Or you could say you get that protection any time there is an action against you that violates that, whether that action is the end result intent or an intent of a means to accomplish the end result. So I think if I'm understanding correctly, Your Honor, and please let me know if I'm not, our position is that so long as the family membership in this case is a central reason that the applicant is targeted for harm, it's irrelevant whether that was as a means to a separate end or as an end itself. And I, that seems to me the way the statute is read, I'm frustrated about the opinions elsewhere in this country that try to add that additional complexity distinction, which I just don't see in the statute at all. The question is, what was your action, not whether we characterize it as an end or means. And that's your position as well. Exactly, Your Honor. And I think that also comports with the board's longstanding, the prior way that the board talked about the test, which was always only focused on identifying the centrality. What was the central reason this applicant was targeted by the persecutor and didn't require applicants to go beyond centrality to show the, you know, why the characteristic was central? Was it a means? Was it an end? That was not historically relevant. But you have to decide that it was a motive. Certainly. Yes, Your Honor. It has to be a central reason. It cannot be minor or incidental. And we can, you know, agree with that interpretation of the statute. Didn't the board, though, find there was, it was not, family membership was not a central reason? In this case, Your Honor? Yes, that's correct. The board found that the family had not established that their family membership was a central reason. And we think that's air. So, you know, so looking at it through that lens is really not a means and question that matters because your client lost on the essential motive determination. I guess your response to that is a lack of substantial evidence. That's one of our arguments, Your Honor. But I think also when you look at the manner in which the board applied the MRMS framework to this family's case, it was done in service of this means to end framing. And a separate issue with the decision, which is the imposition of an animus requirement that we haven't discussed yet, but the board started its analysis by identifying and looking for evidence that there was animus against this family. Then they turned to identifying the ultimate goal of the cartel, which they found to be possessing the family's land. And so we would argue that the factual findings made in this case were made in service of that legal framework that is not consistent with the statute. So that is one, you know, one basis for overturning the board's analysis here. Is that why you would probably say it's not dicta? Is that your position? The Sixth Circuit case that you, 28J, treats it that way, why shouldn't we? So the Sixth Circuit, when they talk about the framework that MRMS sets out as dicta, does so on the assumption that there's no record evidence in our family's case showing that there is a central reason for harm. They said basically that this family would have lost in any event, so the board didn't need to go into the framework and the broader legal analysis. There is substantial evidence of nexus in this case, and of course the Sixth Circuit didn't have the benefit of reviewing the record. So that is why we think it's not simply dicta and it's not appropriate for, or wouldn't have been appropriate for the board to simply deny on the application of the one central reason test. But before you talk about nexus, the evidence for or against it, you have to decide nexus to what? And that's what 1101A says, there's five, four or five things that are the what's. And family is not mentioned. And yet in some of the case law, the family is assumed to be always mentioned, always included in this particular well-founded fear of in a particular social group. What is your position that family by itself is a particular social group? Or does it have to be only a family that is widely recognized as a social group, such as a dynasty? In some countries where families are the ruling dynasty for a long time, that there has to be something special about the family before it's a particular social group. Because I was struck, if Congress really intended family to be by itself the test, I would have thought they would have surely included the word family in the definition. And they didn't. So I'm having trouble with that very premise, not before you get to nexus, is nexus to what? And I don't see how you can find in this statute that nexus to an ordinary family is enough. Yes, Your Honor. So since 1985, in the matter of Acosta decision, which was the Board of Immigration Appeals' first decision really looking at the statute, at the Refugee Act that establishes the standard that you were just quoting from. In that very first decision, the board recognized that family can be a cognizable social group. Now we are told by the Supreme Court, no longer do we need to give deference to that. So all of a sudden, we can look at it de novo. And in some ways, I'm unhappy with that change by the Supreme Court, in other ways, I'm not. In this case, it somehow frees me up to say, maybe that premise wasn't right, right from the very beginning. I think it was, Your Honor. And I think looking at the Acosta decision, which sets out why it's appropriate, continues to be an appropriate manner of statutory analysis. So every family, not just a uniquely, widely recognized, I mean, everybody is a member of a family. And so that basically would mean, that's just an enormous expansion of this statute. Yes, Your Honor, I have a couple points in response, though. First, I would note that the board itself agrees and has... I know the board does. Okay. This would be a question of saying, the board, I think you got it wrong. Where is the word family in there? And if it's family, then it has no meaning at all, because everybody's a member of the family. The same is true, though, Your Honor, for the other protected grounds listed. Almost everyone has a nationality, almost everyone has a religion, many people have political opinions. Yeah, but those are very widely broad groups, and you can imagine people having real hatred for a different nationality or a different ethnicity. But if you just say, well, the family is involved, I just think that's a staggeringly expansion of the scope of the statute. So in the Acosta decision, the board looks at the other protected grounds and identifies the common thread in all of them, which is that these are characteristics that are fundamental to someone's identity and that they either cannot or should not be required to change. And in applying that analysis to the particular social group ground, the board listed examples of other characteristics that are inherently fundamental to one's identity. And if you are subject to persecution on account of those protected grounds, finding that that is a circumstance where that person would qualify for protection. Family membership is an inherent part of your identity. It's something that you cannot change. And if you're faced with a situation where you are going to be subject to serious harm or death because of this characteristic that's fundamental to your being that you have no way of avoiding, that the board found that that was an appropriate application of the social group ground. And we agree with that. I think, too, the other thing to keep in mind is when setting out the contours and the scope of the particular social group ground, there are other elements of the asylum definition that have to be met before the applicant is eligible for protection. So family may be a big group. Everyone has a family for the most part, but that certainly doesn't mean that everyone who has a family is entitled to asylum in the U.S. They have to meet all the other elements. Just the same that someone who has a nationality, that fact alone isn't what makes them eligible. It's what lets them proceed with a claim to see if they can show the other elements. And so if there is nexus based on the family membership on this immutable characteristic that the person holds. So you just have two neighbors, Hatfield and McCoy, that don't like each other, and they can say, well, I'm a Hatfield, and McCoy's don't like me, and so I want to get out of this country. So if the, I think that this is something that, depending on a number of factors, there could be. Everybody's got neighbors that don't like them, or you probably, if you extended the word neighbor broadly, you could find somebody, not everybody, but certainly it's not uncommon to have a neighbor with a conflict. This is where the nexus element comes in, Your Honor. If this is a simple issue of a personal vendetta over a boundary dispute in your land. But the nexus is there. As long as you accept family, then you can say, that is why I'm being discriminated against, for sure. I don't think that's true, Your Honor. Looking at the number of cases that have found that family membership was not a central reason for harm in different cases, it sometimes is simply a personal vendetta where the family membership doesn't play a role. But there certainly are cases as well where a family is targeted specifically because of the family that they belong to. The neighbor is not the family because of any characteristic of the family. It is simply a means of getting to who has title to the property. I think that in this case, the ownership and possession of this ancestral land is the flip side of the family membership. These are two sides of the same coin. And it's true that the cartel had a central reason of obtaining the family's land. But the fact that the cartel continued to threaten the CR family even after they left their land gets to this very point about the immutable characteristic that I was making earlier. They continue to be threatened after complying with the cartel's demands. That shows that even under MRMS's more restrictive framework, the family membership was a central reason for harm because the cartel had achieved their ultimate goal. They got the land. No, they hadn't achieved it until they neutralized the ability that that family would ever come back and reclaim the land. They had to get that family completely out of the picture. Exactly, Your Honor. And if the family is returned to Mexico after facing these death threats from the cartel, there is every reason to suspect on this record that the cartel will again go after the family and attempt to either seriously harm or kill them to prevent them from taking the land because of their family membership. Because their family membership gives them the right to challenge the cartel for the land. And that's the exact point of the asylum statute, which is to offer protection when that immutable characteristic puts you at serious risk of harm or death. And I see that. I don't think it's a part of the case, but isn't there some reason to believe that the family could have relocated somewhere within Mexico? And is there any showing that the Mexican government was unable or unwilling to protect them from the cartels? And I think at least one family member stayed in Mexico, relocated in Mexico. Why isn't that a factor, an indication they don't need asylum in this country, but they can be relocated within their home country? So you're correct, Your Honor, that that's not on review before this board or before this panel, excuse me. But it is something that would be considered before the family would be granted asylum. So finding nexus established is the next part of the analysis. And if this court finds that nexus is established, the case goes back down and the analysis continues. The judge would consider in the first instance that exact question. Could the family relocate? Could the family seek protection from the government? We think that there's record evidence showing that both don't work. But those would be factored before the family would be granted protection. They just haven't been considered yet and are independent elements from the nexus element. Thank you, counsel. Thank you. I have one more question, if I may. We've been talking just now about assuming the rule is what it is, whether substantial evidence would play out here against your client's position. I want to direct you back to the rule that you are challenging as inaccurately stating the applicable law that begins if a persecutor is targeting. So if you were going to take a red pen to that sentence and make it correct, what would you do? What would be the, leaving aside sort of the more holistic arguments presented in your brief, just, it seems to me, and I'm not going to tell you what I think yet, I want to ask you what you think, there's a simple fix that would make this lawful. But I'm curious to know if you see that in here. I think that one way to make this lawful, Your Honor, would be to go back to the way that Matter of LEA 1 talked about this, saying if a family is being targeted solely as a means to an end, that's not sufficient to answer the nexus question. I think as written, the two issues that you would be fixing there would be the kind of categorical pronouncement that family membership cannot be a central reason if there's an ultimate goal, a separate ultimate goal in the persecutor's mind, and you would be removing the requirement that the means to an end framework be satisfied rather than the statutory central reason test. So if the court had said, the BIA had said family membership may be incidental, or if the BIA had said family membership is only incidental and it is therefore not one central reason, would those be more likely to comport with a correct statement of the law? I think that would be moving it closer to a correct statement, Your Honor, but to the extent it still suggested that the core question was this means to end framing, we would still take issue with that as a contortion. So put aside the means to end framing for a second. Do you agree that if we could get a time machine and go back and rewrite this, those sorts of changes would be more consistent with what the applicable law requires? Do you agree with that? I think they would be more consistent, yes. Okay. On the means end piece, I'm not understanding how your argument with what's left of it, assuming that there's a way to fix this, comports with how we analyzed this area of law in Arianna. In the Arianna Racinos decision, Your Honor? Yes. So in that case, this court applied the LEA 1 framework, and the court was very clear that they weren't weighing in on the validity of that framework, so that remains an open question in the circuit. The application of that framework to the Arianna Racinos's family case was consistent with LEA 1 in that the fact that the gang's motive could be seen as a means to an end was not taken as dispositive. It was an appropriate consideration on the facts, but the court also looked at other evidence to find that there was not central reason established in that case. So it was part of the analysis, and I think it's permissible for this to be part one way that the court thinks about the nexus test. It's the making it the new framework that's the issue, and making that the dispositive question versus the statutory one central reason. Thank you. Thank you, counsel. Thank you. Let's hear from the government. Good morning. Sarah Pergolesi for the government, may it please the court. The Supreme Court has held in Elias Zacharias that the statute makes motive critical, and the statutory text that the Supreme Court quotes there is the full phrase, persecution on account of a protected ground. I think the main frustration that you, Judge Ebel, have really articulated in your issue with family cases in general, speaks to the importance of nexus, as my colleague also said. It's really where the rubber meets the road in these cases, and critically, it's where if there is a lack of an intent to overcome or animus, an applicant has a hard time showing that their protected characteristic, their protected trait, is sufficiently central to meet the motive standard. Counsel, can I ask you to focus on the same line that I just discussed with the petitioner? So do you agree that this statement, this sentence, is a clear if-then statement? It's a clear categorical statement? Yes, I do. I do also think, though, that the petitioners ignore a really critical word in that sentence, which is the words unrelated to. And that really points, again, to what the agency is talking about, both in this case, dealing with the facts of this case specifically, and in a way where they're holding maybe applied prospectively to other cases. Okay, so accounting for the word unrelated, it's in the sentence. In your briefing, you twice added the word only to the BIA's rule, which in my discussion with your friend, I think would make this rule a whole lot more consistent with the applicable law. The problem is, that's in your brief and not in the BIA's decision. Sure. It's also in this court's decision in Orion Racinos, in how it describes the standard. So the problem that I see here is that the law as stated, this categorical rule as stated, and now with the instructions we get from Loper-Bright, we are interpreting the INA. The INA allows mixed motive claims. This doesn't seem to. The INA requires examination of the record as a whole. This seems to prevent the BIA from doing that. And the INA applies the same nexus standard across claims. And leaving aside for a moment my colleague's concerns about family-based claims generally, this seems to disaggregate those and apply different standards. So how are my concerns misplaced? Well, again, I do think that the unrelated to language is doing a lot of work with respect to your concerns. Maybe I don't understand your argument. Let me explain. And let me just also point to that exact language. And I think the exact language that we're all talking about is on page 7 of the record, in that final complete paragraph. Again, if a persecutor is targeting members of a certain family as a means to achieving some other ultimate goal unrelated to the protected ground, family membership is incidental or subordinate to that other ultimate goal, and therefore not central, one central reason for the harm. So I think, again, that the unrelated language is doing something similar, if not identical, to the way I've articulated the standard and the way this Court has articulated the standard in Oriana Racino's that a means as only or merely a means to a non-protected end. This case, MRMS and LEA-1, they both are dealing with family claims specifically, but I think they're also dealing more broadly and more generally with an issue that we are seeing in asylum cases generally, where there is the problem where there's widespread generalized crime in a country. And typically, the statute doesn't protect against that. But as this decision does not hold, and I am not arguing and the statute does not require, right, the presence of that non-protected motive is not preclusive. The agency cannot credibly, in accordance with the statute and the plain text of the statute, find that the presence of that generalized crime ends the inquiry. And the Board explicitly says that elsewhere in this decision. But they then must do the careful, fact-specific work of whether a protected trait, be it family or something else, is also sufficiently central. And central means not incident, not, excuse me, more than incidental, tangential, et cetera. And I think, again, what this sentence and this discussion of means to ends generally is really getting at is that where the protected trait is really only relevant to the extent that it makes someone attractive for generalized crime, then it is not a sufficiently central motive. But that's not what this sentence says. Your statement of the law isn't incorrect. But that's not what this sentence says. So the perniciousness, I think, here is that this is a published opinion. And this statement of law is dubious. Sure. And so if you could answer the following question for me, let's just assume that we find a problem with the statement of the law that warrants some reversal. You haven't argued that we shouldn't remand this because it would be futile to do so or on harmlessness grounds because the substantial evidence would support you. Am I right in understanding that you have not asked us to do that? Not in our briefing. But I would like to make the point here that the agency in applying the standards that it describes in the first part of this decision do not rest solely on the fact that the family membership was simply or was, sorry, I don't want to add simply and again, but was a means to an unprotected ground unrelated to the family membership. Rather, the agency does do that fact-specific work in the application portion of this decision and finds that the record evidence as a whole showed that the nonprotected motive was central and showed that the protected motive was not sufficiently central. So is it your position that it's dicta? I think what this sentence is really saying, and I think the description both of animus and means to an end is further clarifying and explaining what centrality means and doesn't mean. But I understand your concern with this exact sentence. But I urge the court to look at the decision as a whole, both in the description of the law as a whole and its application of that law in this particular case. After Loper-Bright, of course, I also agree with my colleague that the court is no longer required to afford any deference to the agency's decisions. But the Supreme Court left intact Skidmore respect. And the board has a particular expertise in determining what the words of this statute and especially the contours of persecution and motive mean in the context of asylum and withholding of removal. And so the board's articulations of those standards are deserving of respect in this case and in the long line of cases that my colleague does not challenge. I think, Judge Rochman, you were getting to that issue in your questions in the sense that the petitioners in this case have made explicit that they are not challenging LEA-1. And I don't see very much, if at all, if any, room between LEA-1 and MRMS. Maybe the exact braid of phrasings and explanation and incorporation is different in MRMS. But the hairs, the individual strands that create that braid come from published precedent from the board that the petitioners have not challenged and some of which that this court has explicitly deferred to, including matter of JBN in Delicati. Motive seems like such a nebulous element to prove by a family on the run trying to prove the motive of a drug cartel in northern or central Mexico. It seems like the proof problems here are enormous. But that's the nature of asylum claims in general, not this case specifically. I think even in matter of SP, the board made very clear that it is difficult to prove motive. The board in SP made clear that an applicant is not required to definitively prove the exact motive or motives of their persecutor. But they did not dispel the applicant their burden of proof to provide direct and circumstantial evidence so that the agency can ascertain what the motive or motives may be. And in this case, that's where the applicant has failed. They have not provided enough evidence to prove that motive. You use the phrase substantially central. Is that just a rephrasing of incidental? Yeah, yeah. Sufficiently central was just my paraphrase of how the agency and courts of appeals, including this court, have defined what central means. And why is family membership incidental in this case? Given the fact that we have, I'm not sure who owns the title here, but presumably the children would be heirs to the property at some point. Why is family membership incidental rather than central? Because that's the only way to extort this land. Well, again, because the applicant failed to provide evidence that the family membership as such per se is what motivated the cartel to act. This court in Oriana-Renzon and in a number of cases, both applying LEA-1 and just approving of an agency's conclusion of no nexus in general, have really made that family membership per se must be the motivation. That's a standard that this court has accepted. In this case, the evidence that we have is that the applicants lived in a community that was the subject of a territorial dispute with this cartel. The cartel was interested not only in possessing the land that the applicant and their family possessed, but also the land of the entire community. And the evidence in this case is almost the strongest I've seen of that non-protected general motive for the community at large. When we zoom into the applicant's own personal circumstances, again, the evidence is not sufficient, especially at this stage, to compel reversal of the agency's conclusion because the threats that the cartel levied against the applicant were tethered to the possession of the land. In Oriana-Renzon, I think the court noted that another important factor, which I think gets to your question, Judge, about relocation, whether it's possible within Mexico, the court looked at the question of if the non-protected desire had been met, would the family be continued to be pursued? And again, the evidence in this case does not cut either way, but that also means it doesn't compel the contrary conclusion. The applicant received one phone call while they were in Juarez, but they weren't pursued in person. It's not clear that the threat remained menacing, and it's also the applicant never told the cartel that they had no intention of coming back to reclaim the land. That threat was tethered to an assumption that they would return and reclaim the land. I think this dropped out of the case, but I think I might have heard you say that a particular social group might be landowners in Madero, Mexico. Would that be a cognizable social group? It's a possibly cognizable social group, but the immigration judge specifically found that the applicants had not provided sufficient proof that they were members of that social group, and they did not challenge that decision to the board. So that is a fact of the case. That's a non-litigated issue. And so even if it were possible as a ground, it's no longer an issue in the case and outside the scope. I did also want to acknowledge that while the petitioners challenge language in MRMS that discusses the fact that motives, a family motive and another protective trait could be intertwined and takes issue with that language, almost identical language exists in LEA-1, which, again, the petitioners do not challenge. So, again, I think the threads here all sort of exist in other precedents that the applicants haven't challenged, and maybe the way the board has woven those threads together into MRMS is clarification and articulation that differs slightly, but the threads are clearly traced back to portions, other published board decisions that are not at issue in this case, and some of which this court has explicitly deferred to. I also want to quickly make a point of addressing a point in the applicants, if I can very briefly, I see I'm almost out of time. Go ahead. In the petitioner's reply brief, they cite an example of modern slavery in Mauritania as something that would not satisfy the board's test if this means-to-an-ends language is applied strictly. And I really would like to, I know it's not an issue in the case, but I would like to push back on that assumption because the evidence that the portion of the Mauritanian population that is subjected to modern-day slavery. And so, again, I think it really, the petitioners have tethered animus to an intent to punish, but the board has never, has not described it that way in LEA-1 or MRMS, and critically did not apply it that way to the facts of MRMS's case. And with that, I'll ask that the court- Give us a one-sentence definition, your definition of animus. I would describe it as a synonym of persecutory intent or intent to overcome. And I do think it can encompass an intent to subjugate or an intent to control. Could I say one more thing about animus and the definition thereof? I'm so sorry. I did really also want to point out that I don't think Pineda Maldonado from the First Circuit or the Sixth Circuit's recent decision in Mazar-i-August Rodas deal with this exact argument. They did not address how animus is defined by the board in this specific way in MRMS, and to the extent that Pineda Maldonado, the panel noted that the board hadn't defined animus, and if it means only hostility, it's not required. And then in Mazar-i-August Rodas, the court rejected the possibility of animus being a requirement, but never even attempted to define it. Sorry. I did want to make that final point. She went over a little bit, so if you want 90 seconds for rebuttal, you're welcome. Thank you. Sorry. You were going to ask me anyway, right? I was, but I appreciate the offer. Thank you. So just a few points on rebuttal, Your Honors. Regarding the language about whether the ultimate goal is related, unrelated to the protected ground, that doesn't save MRMS from being inconsistent with the statute. The point of the mixed motive standard established by the statute is that there can be a myriad reasons why a persecutor targets an applicant, some related to the protected ground, some unrelated. The fact that a protected ground is unrelated to the ultimate goal is the exact point of the mixed motive statute and what Congress intended to protect when it enacted that statute. If this family didn't have ownership in that land, they wouldn't have been prosecuted, would they? I don't know that it's clear, Your Honor. So, for example, if we assume that the family was, well, I would say this. Let's just say they were tenants, but they didn't have any ownership in the land whatsoever. I think if they were tenants and didn't have ownership in the land at all, there's no reason to suppose that the cartel would have continued to target them with death threats after they relinquished the land to the cartel. It's the precise fact of their family membership and their historical possession of the land that gives them the right to continue challenging. They complied with the cartel's demand. And this is a point that I think the board doesn't grapple with, which is one of our substantial evidence arguments. The board assumes that all of the threats were just predicated on getting the family off of the land. In fact, the cartel continued to threaten them after they left, which I think puts them in a different situation than if they had just been tenants because the threatening after the fact really shows that the cartel is going to inflict harm or death on them if they return because of that family membership. And I realize I'm out of time. Thank you, Counsel. We appreciate the arguments. Anything else? Counsel is excused and the case is submitted. Thank you.